Alabama Insurance Guaranty Association (AIGA), as successor-in-interest to Lawler Mobile Homes, Inc., filed an action in the Circuit Court of Lee County, requesting, among other things, that Corene Hinkle's workmen's compensation benefits be terminated, pursuant to § 25-5-57(a)(4)b., Code 1975. Following oral proceedings, the trial court terminated Hinkle's benefits. Hinkle appeals.
The sole issue on appeal is whether the trial court erred in terminating Hinkle's compensation benefits. *Page 94 
Section 25-5-57(a)(4)b. provides the following:
 "At any time, the employer may petition the court that awarded or approved compensation for permanent total disability to alter, amend, or revise the award or approval of the compensation on the ground that as a result of physical or vocational rehabilitation, or otherwise, the disability from which the employee suffers is no longer a permanent total disability and, if the court is so satisfied after a hearing, it shall alter, amend, or revise the award accordingly."
The burden of persuasion in a § 25-5-57(a)(4)b. determination is on the employer. Cerrock Wire Cable Co. v. Johnson,533 So.2d 622 (Ala.Civ.App. 1988). Upon hearing the evidence, the court must revisit the test for permanent total disability and determine if the once-proved disability has now been removed.
The test for permanent total disability is the inability to perform one's trade and the inability to find gainful employment. Mead Paper Co. v. Brizendine, 575 So.2d 571
(Ala.Civ.App. 1990). Total disability does not mean entire physical disability or absolute helplessness. Genpak Corp. v. Gibson,534 So.2d 312 (Ala.Civ.App. 1988). It is the duty of the trial court to make some determination as to the extent of disability. Genpak. The trial court is not bound by expert testimony. Genpak. In making the determination, the court must consider all the evidence, including its own observations, and interpret it to its own best judgment. Genpak.
In a workmen's compensation case, this court's review is limited to a determination of whether there is any legal evidence to support the trial court's conclusions. If a reasonable view of the evidence supports the findings of the trial court, this court may then determine whether the correct legal conclusions have been drawn therefrom. Ex parte EastwoodFoods, Inc., 575 So.2d 91 (Ala. 1991). The new and revised Workers' Compensation Act passed by the legislature and effective August 1992 does not apply to this case. Henderson v.Johnson, 632 So.2d 488 (Ala.Civ.App. 1993).
The record reflects that in January 1980 Hinkle was involved in a work-related automobile accident which caused injury to her neck. After the accident she was treated by a number of physicians. She received medicinal and surgical treatment, as well as extensive physical therapy. Her primary treating physician was Dr. Ronald W. Hillyer, an orthopedic surgeon. Shortly after the accident, due to depression and chronic pain, she began seeing Dr. Chester Jenkins, a psychiatrist, on a regular basis. Both physicians testified at the 1983 trial, and both agreed that due to her pain and the resulting psychological problems, she was not able to be gainfully employed. As a result of their testimony, the trial court found Hinkle to be totally and permanently disabled.
AIGA filed the present action in November 1991, seeking to have the prior determination set aside. AIGA submitted deposition testimony from Dr. Graham Howorth, an orthopedic surgeon, and Dr. H.E. Logue, a psychiatrist, to support its position. AIGA also provided the court with surveillance videotapes depicting Hinkle's daily activities. Hinkle presented the depositions of Dr. Hillyer and Dr. Jenkins to support her position.
Dr. Howorth examined Hinkle in May 1992 at the request of AIGA. He observed some limitation of motion in her neck, with minimal, if any, pain on movement. His overall assessment of Hinkle's condition was that she had a very complicated past medical history, with many complaints, some of which did not relate to her 1980 injury. He did not think that continued physical therapy would help her to operate at a higher functional level. He thought that her personality tended to overemphasize her ailments. Concerning gainful employment, Howorth opined "that there would be something within the limits of her physical capacity that she may be able to do."
At the request of AIGA, Dr. Logue examined Hinkle in January 1993. Following his examination, he concluded that Hinkle suffered from chronic depression pertaining to her inability to get over her injury and to go back to work. He was of the impression that she had some physical pain and that the *Page 95 
psychology of her personality affected her physical symptoms. He found that she was suffering from moderate psychosocial stressors, primarily financial in nature. He opined that her level of functioning was at 40% to 50% of that of a normal person without any psychological complaints. He expressed an 85% to 95% confidence in his evaluation, but also thought that it would be helpful to have corroborative or conflicting information.
Subsequent to his examination of Hinkle, AIGA furnished Dr. Logue with additional material relating to the action. He received a partial transcript of the 1983 hearing; certain excerpts from Dr. Hillyer's records, as well as a copy of his deposition; a copy of the surveillance videotapes; a copy of Dr. Jenkins's office notes; and a copy of Dr. Howorth's deposition.
In light of the additional information received, Dr. Logue changed his evaluation of Hinkle's condition. His subsequent opinion was that Hinkle suffered from two psychological disorders, the first one being depression caused by a "change in lifestyle." He explained that "[s]he has had to switch to a different type lifestyle, which hasn't been as happy. It's a miserable lifestyle that she's chosen. And I think that is the reason she maintains the depression, she's just not happy with her lifestyle." He further believed that Hinkle demonstrated an obsessive/compulsive personality, which he described as being "actively working at staying sick . . . rather than working at getting well." Dr. Logue believed that Hinkle's conscious perpetuation of the disability was an illness in itself which needed to be addressed. He opined that she was not psychologically well and that she was functioning at "around the 40 percent." Dr. Logue suggested that she was in need of a more aggressive treatment. He, however, was of the opinion that her psychological disfunction was no longer related to the 1980 injury.
Dr. Logue testified that his changed opinion was based on evidence contained in Dr. Hillyer's records of an alteration of a prescription for narcotic analgesics, on the surveillance videotapes, and on Dr. Howorth's statement that he could find no substantive evidence for the pain. He was particularly interested in the videotapes because, in his opinion, their content directly contradicted Hinkle's statements to him concerning physical functions which she could or could not do without pain.
The videotapes which were admitted into evidence were the work product of an investigating firm hired by AIGA. The videotapes depicted some of Hinkle's daily activities on three days in 1991 and four days in 1993.
Dr. Hillyer testified, in deposition, that he began treating Hinkle in 1980, shortly after the accident. For the last 13 years he has been treating her for cervical and thoracic pain, which he relates to the 1980 injury. He noted that she has had a cervical diskectomy and "maybe" a lumbar diskectomy during the course of her treatment. The lumbar problem is not connected to the 1980 injury. He has treated her with different medications and, at times, extensive physical therapy. At the time of the hearing, she was taking muscle relaxants and pain killers. Dr. Hillyer testified that Hinkle's condition has not changed in the last 13 years and that due to her episodes of discomfort, spasms, and anxiety, she would be unable to sustain employment on a day-to-day basis.
Dr. Jenkins testified, by deposition, that he began treating Hinkle in 1980 for depression and for chronic pain. He believed that both disorders were causally related to the 1980 accident. He treated Hinkle with supportive therapy and with antidepressants and tranquilizers. Dr. Jenkins stopped treating Hinkle in the summer of 1992 due to his relocation. He testified that when he last saw Hinkle, she did not seem to be capable of being gainfully employed.
Hinkle testified that she has been unable to seek employment because she still experiences episodes of pain and is unable to sit or stand for long periods of time. She testified that she has her good days and her bad days. On her good days she tries to perform normal activities. She stated, however, that she eventually pays for such activities. She stated that she has not experienced any improvement with her mental or physical condition since she last testified in 1983. *Page 96 
In determining that Hinkle no longer suffered from a total and permanent disability, the trial court made the following finding:
 "There is medical testimony that supports Defendant's claims.
 "The most convincing evidence in this case are photographs and videotapes secretly made of the Defendant by AIGA. The photographs and videos show Defendant engaged in various activities, including getting in and out of an automobile; driving an automobile, including looking over both shoulders prior to backing up; bending into the open trunk compartment; shopping at various stores; painting a poster; apparently cleaning a swimming pool; and carrying groceries.
 "The videos were taken on seven different days (three in 1991 and four in 1993). In none of these photographs and videos does the Defendant exhibit any evidence of pain, difficulty, or hesitancy of movement, or restricted physical activity. In contrast to her courtroom demeanor, there are no grimaces of pain.
 "A picture is worth a thousand words. These photographs and videos lead to the conclusion that Defendant is not totally and permanently disabled at this time."
We have thoroughly reviewed the record and viewed the videotapes in their entirety and find that a reasonable view of the evidence fails to support the findings of the trial court.
Although the court was not bound by the expert medical testimony, we note that there was no medical evidence to support the court's decision. Dr. Hillyer and Dr. Jenkins believed that Hinkle remained unemployable. Dr. Howorth was of the opinion that she "may be" able to find employment within the "limits of her physical capacity." Although Dr. Logue concluded that Hinkle was consciously perpetuating her disability, he still believed that she was seriously psychologically impaired and that she was only functioning at "around the 40 percent." We find Dr. Logue's assessment that her psychological impairment was no longer related to the 1980 accident to be in direct conflict with his ultimate diagnosis. The fact remains — the 1980 accident was the precipitating cause of all of Hinkle's psychological problems.
It appears that the trial court's decision was based primarily on Dr. Logue's assessment and on the videotapes. We have already pointed out the concern we have with placing any reliance on Dr. Logue's testimony. We are equally disturbed that so much emphasis has been placed on the videotapes. We have viewed the videotapes and find them to be unremarkable. They merely show that on some days, over a period of two years, Hinkle was able to engage in some simple activities, such as getting in and out of, and driving, an automobile; turning her head; and lifting a bag of groceries — all without exhibiting overt signs of pain. None of these activities is contrary to the original judgmental finding of the court that Hinkle was permanently and totally disabled, as defined by §25-5-57(a)(4)d. There was evidence that she was encouraged by her physician to be as active as possible.
Our courts have said many times that permanent total disability does not require physical helplessness, but only that the employee be incapacitated from working at one's trade and unable to find gainful employment. Genpak. The court found these requirements to exist in 1983. It appears to this court that in order for a subsequent court to set aside and nullify that judgment, something more must be presented than a showing of a videotape of the former employee getting in and out of her car without writhing in pain.
There are limited interpretations of § 25-5-57(a)(4)b. Our courts have always applied the principle that the workmen's compensation law be liberally interpreted for the benefit of the employee. Dan River Mills, inc. v. Foshee, 365 So.2d 1232
(Ala.Civ.App. 1979). That principle seems particularly applicable to the present provision of the law — the taking away of compensation already granted.
We conclude that no reasonable view of the sparse evidence stated as the basis of the judgment below supports that judgment. The judgment of the trial court is reversed.
The foregoing opinion was prepared by Retired Appellate Judge L. CHARLES *Page 97 
WRIGHT while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975, and this opinion is hereby adopted as that of the court.
REVERSED.
All the Judges concur.